[No. S098242. Feb. 3, 2003.]

HENKEL CORPORATION, Plaintiff and Appellant, v.
HARTFORD ACCIDENT AND INDEMNITY COMPANY et al.,
Defendants and Respondents.

## COUNSEL

Bergman, Wedner & Dacey, Bergman & Dacey, Gregory M. Bergman and Robert M. Mason III for Plaintiff and Appellant.

Brobeck, Phleger & Harrison, Thomas M. Peterson and Brett M. Schuman for Western MacArthur Company as Amicus Curiae on behalf of Plaintiff and Appellant.

Mendes & Mount and Charles Carluccio for Defendant and Respondent Lloyd's of London.

Kelley Drye & Warren, Cynthia S. Papsdorf, Laurie DeYoung, William C. Heck and Sarah L. Reid for Defendant and Respondent Rhone-Poulenc, Inc.

Hogan & Hartson, Robert E. Postawko and Patrick F. Hofer for Defendant and Respondent Hartford Accident and Indemnity Company.

Berman & Aiwasian and Alan S. Berman for Defendant and Respondent Century Indemnity Company.

Hancock Rothert & Bunshoft, Paul J. Killion and Mikel A. Glavinovich for London Market Insurers as Amicus Curiae on behalf of Defendants and Respondents.

Wiley, Rein & Fielding, Laura A. Foggan, John C. Yang; Sinnott, Dito, Moura & Puebla and Randy M. Marmor for Insurance Environmental Litigation Association as Amicus Curiae on behalf of Defendant and Respondent Hartford Accident and Indemnity Company.

## OPINION

**KENNARD, J.**—Through a series of agreements, plaintiff Henkel Corporation (Henkel) acquired the metallic chemical product line of Amchem Products, Inc. (Amchem No. 1),[1] and assumed all related liabilities. The question here is whether Henkel also acquired the benefits of the insurance policies issued by defendants to Amchem No. 1 to cover lawsuits based on injuries sustained during the policy period.

Finding no specific language in the agreements assigning policies or policy benefits to Henkel or its predecessor, and no document in which defendant insurers consented to any assignment, the trial court entered summary judgment for defendants. The Court of Appeal reversed. It reasoned that in the absence of explicit language disclaiming any assignment, the right to insurance benefits passed to Henkel as a matter of law without need for consent from the insurers.

We conclude that under the circumstances of this case any assignment of benefits does require the consent of the insurers, and therefore reverse the judgment of the Court of Appeal.

### I. SUMMARY OF THE CORPORATE TRANSACTIONS

Amchem No. 1, a Pennsylvania corporation, had two distinct product lines: agricultural chemicals and metallic chemicals. The metallic chemicals, which help paint adhere to metal, were sold to car and airplane manufacturers, including Lockheed. Defendants insured both of Amchem No. 1's product lines.

In 1977, Union Carbide Corporation acquired Amchem No. 1 by stock purchase and merger. In 1979, Amchem No. 1, now a Union Carbide subsidiary, created a new corporation, also known as Amchem Products, Inc., but a Delaware corporation (Amchem No. 2). By resolution of its board of directors, Amchem No. 1 transferred "all of its right, title and interest . . . in and to its domestic assets utilized in its metalworking business" to Amchem No 2.[2] The board of directors of newly created Amchem No. 2 accepted the transfer from Amchem No. 1 of the "assets, liabilities and

---

[1]Following the lead of the Court of Appeal, we distinguish between the two corporations named Amchem Products, Inc., by referring to the Pennsylvania corporation as Amchem No. 1 and the Delaware corporation as Amchem No. 2.

[2]At the same time, Amchem No. 1 changed its name to Union Carbide Agricultural Products Company, Inc., reflecting that its product line was now limited to agricultural products. For convenience, we will continue to refer to the company as Amchem No. 1.

goodwill utilized in its metalworking chemical activities." This transaction was a contract: the resolution of Amchem No. 1's board of directors was an offer (see *Dow v. River Farms Co.* (1952) 110 Cal.App.2d 403 [243 P.2d 95]; *Hoge v. Lava Cap Gold Mining Corp.* (1942) 55 Cal.App.2d 176 [130 P.2d 470]) and the resolution of Amchem No. 2's board of directors explicitly accepted that offer. Although the 1979 contract referred to "assets" and "liabilities," it did not specify what assets were transferred to Amchem No. 2, or what liabilities were assumed.

After the 1979 contract, Amchem No. 1 (agricultural products) and Amchem No. 2 (metallic chemicals) were separate subsidiaries of Union Carbide. In 1980, however, Union Carbide sold all of the stock of Amchem No. 2 to plaintiff Henkel. By acquiring the stock of Amchem No. 2, Henkel acquired all of its assets and liabilities. After Henkel purchased Amchem No. 2, these two corporations merged. In 1986, Union Carbide sold Amchem No. 1 to Rhone Poulenc, Inc.; these two companies merged in 1992. Thus, it is undisputed that Henkel has succeeded to all of the rights and obligations of Amchem No. 2, and Rhone Poulenc (now known as Aventis CropScience USA, Inc.) has succeeded to all of the rights and obligations of Amchem No. 1.

## II. BACKGROUND OF THIS LITIGATION

In 1989, current and former Lockheed employees filed suit against Henkel and "Amchem Products, Inc.," without distinguishing between Amchem No. 1 (in 1989 a Rhone Poulenc subsidiary) and Amchem No. 2 (which by 1989 had merged into Henkel). The suit alleged injuries arising from exposure to metallic chemicals during the period between 1959 and 1976. Henkel tendered its defense to defendant insurers, whose policies had insured Amchem No. 1 during portions of this period, and to Henkel's own insurers. All refused coverage.

In 1992, the Lockheed plaintiffs served their complaint on Rhone Poulenc, named as "Amchem Products, Inc." Rhone Poulenc moved to quash service. The Lockheed plaintiffs stipulated to the trial court's granting Rhone Poulenc's motion to quash. The stipulation states that the Lockheed plaintiffs "have been presented with documents establishing that Henkel Corporation is answerable for the liabilities of Amchem Products, Inc. alleged in the Lockheed Consolidated Cases. Accordingly, plaintiffs have no interest in asserting their claims against [Rhone Poulenc]."

In 1995, Henkel settled its suit with the Lockheed plaintiffs for $7.65 million. Defendants[3] refused to contribute to the settlement. Henkel then filed this action for declaratory relief against defendants and Henkel's own insurers. Defendants had Rhone Poulenc added as a necessary party.

In 1998, plaintiff Henkel, defendants, and Rhone Poulenc each filed motions for summary judgment. Because defendants had issued their insurance policies to Amchem No. 1—which no longer existed as an independent entity—the trial court's first concern was to decide which party represented Amchem No. 1. The trial court ruled that Rhone Poulenc, not Henkel, was the corporate successor of Amchem No. 1 and was therefore the entity entitled to the protection of the liability policies defendant insurers had issued to Amchem No. 1.

Amchem No. 2 had assumed all the liabilities of Amchem No. 1 relating to the metallic chemical product line. Plaintiff Henkel then purchased all the stock of Amchem No. 2, which made Henkel responsible for all Amchem No. 2's liabilities, including those inherited from Amchem No. 1. Henkel therefore argued in the trial court that even though it was not the corporate successor to Amchem No. 1, because it was responsible for Amchem No. 1's liabilities relating to metallic chemicals as a matter of law, it should be entitled to the benefits of Amchem No. 1's liability insurance.

The trial court rejected Henkel's argument. It found Henkel responsible for Amchem No. 1's torts, not as a matter of law, but because Henkel had voluntarily assumed that liability. The trial court also rejected Henkel's contention that the 1979 contract, under which Amchem No. 2 acquired the assets and liabilities of Amchem No. 1's metallic chemical business, assigned to Amchem No. 2 the benefits of insurance coverage for those liabilities. Moreover, the court ruled that any such assignment would be void without defendant insurers' consent. The trial court therefore entered summary judgment against Henkel.

The Court of Appeal reversed. Quoting *Northern Ins. Co. of New York v. Allied Mut. Ins.* (9th Cir. 1992) 955 F.2d 1353, 1357 (*Northern Insurance*), it held: The " 'right to indemnity followed the liability rather than the policy itself. As a result, even though the parties did not assign [the predecessor's insurance] policy in the agreement, the right to indemnity under the policy transferred to [the successor corporation] by operation of law.' " (Italics omitted.) We granted petitions for review by Rhone Poulenc and defendants.

---

[3]"Defendants" refers to those Amchem No. 1 insurers who are parties to this appeal. The term does not include the Henkel insurers that were defendants in the trial court but are not parties to this appeal.

III. HENKEL'S LIABILITY FOR INJURIES CAUSED BY AMCHEM NO. 1 ARISES FROM CONTRACT AND WAS NOT IMPOSED BY OPERATION OF LAW

Plaintiff Henkel here renews the argument made in the trial court that when it bought the metallic chemical product business (Amchem No. 2) from Union Carbide in 1980 it incurred liability as a matter of law for injuries caused by those products when they were being manufactured and distributed by Amchem No. 1. Because liability was imposed upon it as a matter of law, Henkel argues it should receive the benefits of Amchem No. 1's liability polices as a matter of law. (See *Northern Insurance, supra,* 955 F.2d at p. 1357.) Defendant insurers contend that the Ninth Circuit Court of Appeals' 1992 decision in *Northern Insurance* was wrong, and that later California cases show that under California law product line tort liability does not include any right to the insurance coverage for the tort. (See *General Accident Ins. Co. v. Superior Court* (1997) 55 Cal.App.4th 1444 [64 Cal.Rptr.2d 781] (*General Accident*); *Quemetco Inc. v. Pacific Automobile Ins. Co.* (1994) 24 Cal.App.4th 494, 499-501 [29 Cal.Rptr.2d 627] (*Quemetco*).) ▆▆ We need not resolve this conflict, because the record shows that Henkel's liability was not imposed involuntarily by law but assumed voluntarily by contract.

Henkel's argument why it should be entitled to Amchem No. 1's insurance protection as a matter of law depends on a showing that Henkel's tort liability was imposed upon it by law. Henkel has failed to make that showing. ▆▆ As we explain, there are *three* situations in which a buyer of corporate assets may be liable for the torts of its predecessor, notwithstanding the purchaser's failure to assume liability by contract, but Henkel does not show that this case falls within any of these categories.

*First,* the buyer of corporate assets may be liable as a corporate successor if "[1] the transaction amounts to a consolidation or merger of the two corporations, [2] the purchasing corporation is a mere continuation of the seller, or [3] the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 [136 Cal.Rptr. 574, 560 P.2d 3]; *Beatrice Co. v. State Bd. of Equalization* (1993) 6 Cal.4th 767, 778 [25 Cal.Rptr.2d 438, 863 P.2d 683].) None of these circumstances is present here: Amchem No. 2 did not acquire Amchem No. 1's metallic chemical business by consolidation or merger. Amchem No. 2 was not a "mere continuation" of Amchem No. 1, because that doctrine does not apply "when recourse to the debtor corporation is available and the two corporations have separate identities." (*Beatrice Co. v. State Bd. of Equalization, supra,* 6 Cal.4th at p. 778.) And there is no

evidence that Amchem No. 1 sold its metallic chemical business to Amchem No. 2 to defraud its creditors.

*Second*, a company that acquires another company's product line may be liable for injuries caused by its predecessor's defective products, if certain conditions are met. One condition is "the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business." (*Ray v. Alad Corp., supra,* 19 Cal.3d at p. 31.) That condition is not met here, because Amchem No. 1 continued to exist after its 1979 sale of the metallic chemical business to Amchem No. 2. Rhone Poulenc, as the 1986 corporate successor of Amchem No. 1, can respond in damages to any product defects suit based on toxic exposure occurring before the 1979 creation of Amchem No. 2. Moreover, even if Amchem No. 1 had dissolved after it transferred its metallic chemical operation to Amchem No. 2, it could still be sued to permit a plaintiff to assert a claim against Amchem No. 1's liability policies. (*Penasquitos, Inc. v. Superior Court* (1991) 53 Cal.3d 1180 [283 Cal.Rptr. 135, 812 P.2d 154].) And there are no grounds for claiming that Amchem No. 1 was destroyed by the 1979 sale of its metallic chemical business to Amchem No. 2. (See *Chaknova v. Wilbur-Ellis Co.* (1999) 69 Cal.App.4th 962, 971 [81 Cal.Rptr.2d 871].)

*Third*, some statutes, notably the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) (CERCLA), impose liability upon successor corporations without regard to contract. (*SmithKline Beecham Corp. v. Rohm and Haas Co.* (3d Cir. 1996) 89 F.3d 154, 163.) No such statute applies to this case.

Thus, Henkel, the buyer of Amchem No. 2, is not liable by operation of law for injuries caused by defective products marketed by Amchem No. 1. Amchem No. 2, however, assumed by contract the liabilities of Amchem No. 1 relating to the metallic chemical business. When Henkel later bought all the stock of Amchem No. 2, that transaction did not change the status of Amchem No. 2 as a legal entity, so Amchem No. 2 continued to be responsible for those liabilities. The later merger of Henkel and Amchem No. 2 left Henkel, as the surviving corporation, responsible for the liabilities of Amchem No. 2, and through it those of Amchem No. 1 relating to the metallic chemical product line.

Amchem No. 2 also acquired the assets of Amchem No. 1 relating to the metallic chemical business, and it continued to own those assets after Henkel acquired all of Amchem No. 2's stock. (See *National American Ins. Co. v. Jamison Agency, Inc.* (8th Cir. 1974) 501 F.2d 1125, 1127.) Henkel later

acquired the assets of Amchem No. 2 by merger. Henkel's rights to any insurance policy benefits, therefore, are those of Amchem No. 2, and depend on the terms of the 1979 contract by which Amchem No. 2 acquired the assets of Amchem No. 1.

Three Court of Appeal decisions, although distinguishable from the case here on other grounds, confirm that the rights of a successor corporation in a case such as this depend upon contract. *Oliver Machinery Co. v. United States Fid. & Guar. Co.* (1986) 187 Cal.App.3d 1510 [232 Cal.Rptr. 691] (*Oliver*) involved the reverse situation in which the distributor for a predecessor sought to take advantage of its successor's insurance policy. The Court of Appeal in that case rejected the argument that the insurance policy should be construed to make coverage coextensive with liability under *Ray v. Alad Corp., supra,* 19 Cal.3d 22; applying established principles for construing insurance policies, it concluded that the policy did not cover the distributor's claim. *Quemetco, supra,* 24 Cal.App.4th 494, which involved liability under CERCLA, relied on *Oliver* to hold that the right of a successor company to the benefits of its predecessor's policy likewise turned on the interpretation of the contract. Similarly, *General Accident, supra,* 55 Cal.App.4th at page 1454, which involved product line liability under *Ray v. Alad Corp., supra,* 19 Cal.3d 22, agreed that the successor's right to its predecessor's insurance policy depended on contract.

Plaintiff Henkel questions here whether the Court of Appeal decisions in *Quemetco* and *General Accident* were correct insofar as they refused to allow a successor to claim rights under its predecessor's liability policies even though liability had been imposed on the successor not through contract, but by operation of law. We perceive no conflict, however, in authority or principle over the rule that when liability is assumed by contract, the successor's rights are defined and limited by that contract.

### IV. ANY ASSIGNMENT OF THE BENEFITS AT ISSUE IS INEFFECTIVE BECAUSE THE INSURERS DID NOT CONSENT

Whether or not Amchem No. 1 assigned any benefits under the liability policies to Amchem No. 2, any such assignment would be invalid because it lacked the insurer's consent. Analysis of this issue must begin with the language of the policies themselves, and in this case there is no dispute that each of the policies contained clauses providing that there could be no "[a]ssignment of interest under this policy" without the insurer's consent endorsed on the policy. Such clauses are generally valid and enforceable. (See *Bergson v. Builders' Ins. Co.* (1869) 38 Cal. 541, 545; *Greco*

*v. Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674, 682 [12 Cal.Rptr. 802].)

Plaintiff Henkel does not claim that any insurer has executed a consent to assignment, but argues on two grounds that under the circumstances here an assignment does not require insurer consent. The first ground, that coverage should follow liability when the liability is transferred by operation of law, fails because, as we explained earlier, Henkel did not acquire the liabilities of Amchem No. 1 by operation of law, but assumed those liabilities by contract. Henkel's second ground for arguing that insurer consent is not required is that under an occurrence-based liability policy (see *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 689 [42 Cal.Rptr.2d 324, 913 P.2d 878]), policy benefits can be assigned without consent once the event giving rise to liability has occurred.

 "It is established that a provision in a contract or a rule of law against assignment does not preclude the assignment of money due or to become due under the contract [citations] or of money damages for the breach of the contract." (*Trubowitch v. Riverbank Canning Co.* (1947) 30 Cal.2d 335, 339-340 [182 P.2d 182].) Cases and commentators have applied this principle to the assignment of benefits under an insurance policy. (See *Westoil Terminals Co. v. Harbor Ins. Co.* (1999) 73 Cal.App.4th 634, 641 [86 Cal.Rptr.2d 636]; *Quemetco, supra,* 24 Cal.App.4th at p. 502; *Greco v. Oregon Mut. Fire Ins. Co., supra,* 191 Cal.App.2d at p. 682; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 7.431, p. 7A-114.) But even if we apply the principle to *liability* policies, it does not bar defendants from enforcing their restrictions on assignment in the case here.

In 1979, when Amchem No. 2 assumed the liabilities of Amchem No. 1, the duty of defendant insurers to defend and indemnify Amchem No. 1 from the claims of the Lockheed plaintiffs had not become an assignable chose in action. Those claims had not been reduced to a sum of money due or to become due under the policy. Defendants had not breached any duty to defend or indemnify Amchem No. 1, so Amchem No. 1 could not assign any cause of action for breach of such duty. (Cf. *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 661-662 [328 P.2d 198, 68 A.L.R.2d 883], which upholds an assignment for wrongful failure to settle a claim.) Consequently, Amchem No. 1 could not assign the right to defense and indemnity against such claims without the insurers' consent.

Nonetheless, Henkel contends we should permit assignment of claims such as those brought by the Lockheed plaintiffs without insurer consent,

because the assignment would not place an additional risk (or burden) on the insurer that it did not bargain to assume. According to Henkel, in this case there is no additional *risk* because the injury occurred before the assignment and the assignment does not affect either liability or policy limits. (*Northern Insurance, supra,* 955 F.2d at p. 1358.) Even assuming enforcement of the no consent clause requires a showing of additional burden or risk on the insurer, Henkel cannot prevail. An additional burden may arise whenever the predecessor corporation still exists or can be revived (see *Penasquitos, Inc. v. Superior Court, supra,* 53 Cal.3d 1180), because of the ubiquitous potential for disputes over the existence and scope of the assignment. If both assignor and assignee were to claim the right to defense, the insurer might effectively be forced to undertake the burden of defending both parties. In view of the potential for such increased burdens, it is reasonable to uphold the insurer's contractual right to accept or reject an assignment.

Recognizing this problem, Henkel argues that under the peculiar facts of this case the insurers face no such dual burden. Henkel points out that when the Lockheed plaintiffs' lawsuit against Rhone Poulenc was dismissed, Henkel, the buyer of Amchem No. 2, was the only remaining entity facing potential liability for toxic injuries to Lockheed employees caused by the metallic chemical products of Amchem No. 1.

Nevertheless, if the Lockheed plaintiffs had refused to dismiss their suit against Rhone Poulenc, defendants would have faced the dilemma whether to defend Rhone Poulenc, Henkel, or both. The Lockheed plaintiffs' decision to proceed only against Henkel, the buyer of Amchem No. 2, and not against both Henkel and Rhone Poulenc, should not affect Henkel's right, if any, to the coverage benefits of Amchem No. 1's liability insurance policies. Those rights arise from and were fixed by contract—the 1979 contract by which Amchem No. 2 acquired the metallic chemical business from Amchem No. 1, the 1980 contract in which Henkel acquired the metallic chemical business by purchasing Amchem No. 2, and the insurance policies, including their "no assignment" provisions—and those rights do not rise or fall on the tactical decisions of tort plaintiffs.

In sum, Henkel does not demonstrate entitlement to the benefits of the liability policies at issue. This case is not analogous to those circumstances under which an assignment without the insurer's consent has been upheld: (1) when at the time of the assignment the benefit has been reduced to a claim for money due or to become due, or (2) when at the time of the assignment the insurer has breached a duty to the insured, and the assignment is of a cause of action to recover damages for that breach. The assignment in this case does not fall within either category.

## V. HENKEL HAS NOT SHOWN THAT IT IS ENTITLED TO REIMBURSEMENT BECAUSE IT DEFENDED AND SETTLED A CLAIM AGAINST AMCHEM NO. I

Plaintiff Henkel argues that even if it did not acquire the insurance benefits at issue here by assignment, it is nevertheless entitled to reimbursement of defense and settlement costs connected to the Lockheed litigation. Henkel claims that having defended and settled the Lockheed case on behalf of "Amchem Products, Inc.," it is entitled to the protection of the Amchem Products' insurance coverage retained by Union Carbide. Henkel's argument confuses Amchem No. 1 and Amchem No. 2. As the corporate successor of Amchem No. 2, Henkel could defend and settle on behalf of that entity, but such action would entitle it only to the policy benefits acquired by Amchem No. 2. Henkel is *not* the corporate successor to Amchem No. 1, and therefore had no right to settle or defend a suit against Amchem No. 1 without the latter's consent.

## DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., Werdegar, J., Brown, J., and Ortega, J.,* concurred.

**MORENO, J.**—I dissent. The majority's decision is contrary to well-settled law and provides an unfair windfall to insurers. The majority's holding allows an insurer to avoid its obligations on hosts of existing claims by refusing to consent to an assignment of policy benefits if the insured business has been sold. That is not the law. Instead, the rule is that the right to recover under a policy after a loss has occurred is an asset assignable separate from the policy itself. After a loss, the policy benefits can be assigned without insurer consent, the no-assignment clause notwithstanding. (*Greco v. Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674, 682-684 [12 Cal.Rptr. 802] (*Greco*).)

### I.

"While the general rule regards liability and indemnity policies as non-assignable personal contracts, assignment is valid following occurrence of the loss insured against and is then regarded as chose in action rather than transfer of actual policy." (2 Couch on Insurance (3d ed. 1997) § 34:25,

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

p. 34-21.) This rule has been long recognized by courts of this state. Over 40 years ago, the Court of Appeal in *Greco* stated that "it is settled that the right to recover . . . after loss has occurred is assignable without [insurance] company consent." (*Greco, supra,* 191 Cal.App.2d at p. 682, citing *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 661-662 [328 P.2d 198, 68 A.L.R.2d 883] ["it is well settled that [a no-assignment clause] does not preclude the transfer of a cause of action for damages for breach of a contract"].) The holding in *Greco* was reaffirmed more recently by the Court of Appeal in *Westoil Terminals Co. v. Harbor Ins. Co.* (1999) 73 Cal.App.4th 634, 641 [86 Cal.Rptr.2d 636] (*Westoil*), which stated that *Greco* "allows for an exception to that rule [that an insurer must consent to assignment] where a loss has already occurred." (See also *University of Judaism v. Transamerica Ins. Co.* (1976) 61 Cal.App.3d 937, 942 [132 Cal.Rptr. 907].)

In addition, courts of other states have agreed that an insured can assign the right to recover for pretransfer injuries without the insurer's consent, notwithstanding a no-assignment clause. (See, e.g., *Imperial Enterprises, Inc. v. Fireman's Fund Ins. Co.* (5th Cir. 1976) 535 F.2d 287, 293 ["the no-assignment clause should not be applied ritualistically and mechanically to forfeit coverage in these circumstances"]; *Ocean Accident & Guar. Corp. v. Southwestern B. Tel. Co.* (8th Cir. 1939) 100 F.2d 441, 444-445; *B.S.B. Diversified Co. v. American Motorists Ins.* (W.D.Wash. 1996) 947 F.Supp. 1476, 1479 ["Even with an anti-assignment clause in an insurance policy, Washington law recognizes an assignment of coverage for an event or activities preceding assignment"]; *Gopher Oil v. American Hardware* (Minn.Ct.App. 1999) 588 N.W.2d 756, 763 ["when events giving rise to an insurer's liability have already occurred, the insurer's risk is not increased by a change in the insured's identity"].)

The majority narrows this long-standing rule permitting assignment after the occurrence of a loss by stating that assignment is only valid when a claim against the policy has been "reduced to a sum of money due or to become due under the policy." (Maj. opn., *ante,* at p. 944.) The majority concludes that the policy benefits at issue here "had not become an assignable chose in action" at the time of the transfer of the metallic chemicals business from Amchem No. 1 to Amchem No. 2, and therefore the right to recover under the policy could not be assigned without the consent of the insurers. (*Ibid.*)

It is unclear from what source the majority's novel conclusion is derived. The majority cites the Court of Appeal decisions in *Westoil, supra,* 73 Cal.App.4th at page 642, and *Greco, supra,* 191 Cal.App.2d at page 682, for

the proposition that benefits under an insurance policy *can* be assigned notwithstanding a contractual provision barring the assignment of such benefits. Yet the majority ignores the actual rule articulated in these cases, that an insured can assign policy benefits once the loss insured against has occurred.

The majority's abandonment of the general rule that "assignment is valid following occurrence of the loss insured against and is then regarded as chose in action rather than transfer of actual policy" seems predicated on a misconception of when a party has a "chose in action." (2 Couch on Insurance, *supra*, § 34:25, p. 34-21.) The majority equates a chose in action with a claim that has been reduced to a sum of money due or to become due. Under the majority's view, it seems that a party must file a claim, and this claim must result in a legal finding of liability, for a chose in action to lie.

A chose in action, however, is not necessarily a claim that has been reduced to a sum of money; it is much broader. In California, a chose in action, also known as a "thing in action," is statutorily defined as "a right to recover money or other personal property by a judicial proceeding." (Civ. Code, § 953.) (See Black's Law Dict. (7th ed. 1999) p. 234 [defining "chose in action" as "[t]he right to bring an action to recover a debt, money, or thing"].) A claim need not have been filed, or a judicial determination made, for there to be a chose in action. Instead, only a right to recover need exist. (See, e.g., *Krusi v. S.J. Amoroso Construction Co., Inc.* (2000) 81 Cal.App.4th 995, 1003 [97 Cal.Rptr.2d 294] [equating a chose in action with a right to bring a lawsuit].)

As explained below, under the policies at issue in this case, a chose in action is established on the date of the *injury*, which is when the loss occurs. Therefore, the policy benefits become assignable without the consent of the insurer on the date of the injury, not, as the majority contends, when a claim for this injury has been reduced to a sum of money due or to become due.

## II.

The insurance contracts at issue in this case are occurrence-based contracts. In *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose*), we held that for occurrence-based insurance contracts, "coverage is triggered by damage or injury occurring during the policy period." (*Id.* at p. 669.) After coverage is triggered, the insurer owes a duty of defense and indemnification under the policy upon the assertion of such claims. It does not matter whether or not the claims are

actually asserted during the policy period. So long as the injury-causing event has occurred during the policy period, coverage is triggered, and a loss has occurred.

In continuous injury cases, such as here, the insured's actions result in claims of continuing or progressively deteriorating bodily injury or property damage. As we said in *Montrose*, "bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." (*Montrose, supra,* 10 Cal.4th at p. 689.) As we later explained in *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 57 [70 Cal.Rptr.2d 118, 948 P.2d 909] (*Aerojet*), "[i]n other words, if specified harm is caused by an included occurrence and results, at least in part, within the policy period, it perdures to all points of time at which some such harm results thereafter."

In the present case, the claims under the policy are based on injuries to the Lockheed plaintiffs arising from exposure to metallic chemicals during the period between 1959 and 1976. During this period, defendant insurers received premiums to insure against injuries caused by Amchem's metallic chemical business. Under our holding in *Montrose*, and reaffirmed in *Aerojet*, since the injuries occurred during the policy period, coverage for these injuries is triggered, and the loss insured against has occurred. (*Montrose, supra,* 10 Cal.4th at p. 669.)

Given this settled law, is unclear how the majority's understanding that the policy benefits are assignable only after they are reduced to a monetary sum can be reconciled with *Montrose*. (*Montrose, supra,* 10 Cal.4th at p. 669.) The majority mentions *Montrose* only once, in characterizing Henkel's argument. (See maj. opn., *ante*, at p. 944.) In determining that the policy benefits at issue in this case were not assignable because the claims had not been reduced to a monetary sum, the majority makes no mention of this controlling case. Yet *Montrose* makes clear that an insurer's coverage liability under an occurrence-based policy is determined as of the date of the claimant's loss or injury, irrespective of when the claim is asserted and reduced to a monetary sum. (*Montrose,* at p. 669.) This rule is especially important in a continuous injury case, because often a claim for such an injury will not be filed until the policy period that was in effect at the time of the injury has ended.

If the majority's conclusion is applied beyond the assignment context, an insurer could avoid its obligations even if the policy benefits had not been

transferred to another party. For example, suppose an insurer covered Company A from 1990 until 2000. In 1998, Plaintiff is injured by Company A. In 2001, Plaintiff sues Company A to recover for her injury (and the suit is brought within the relevant statute of limitations period). The insurer can argue that Plaintiff's injury was not covered by the policy, since the claim was not reduced to a monetary sum, and therefore, according to the majority, the right to recover under the policy did not exist until after the policy had expired.

Clearly, this result would contravene the purpose of an occurrence-based policy. For these policies, coverage is established on the date of the event causing the injury. (*Montrose, supra,* 10 Cal.4th at p. 669.) Therefore, when the injury-causing event occurs during the policy period, the loss has occurred, a chose in action is established, and the right to recover under that policy is assignable without insurer consent. (*Greco, supra,* 191 Cal.App.2d at p. 682.)

## III.

The rule permitting assignment of the right to recover for injuries occurring prior to the transfer is consistent with the purpose of a no-assignment clause. In interpreting an insurance contract, courts "read[] the policy's 'language in context with regard to its intended function in the policy.'" (*Galanty v. Paul Revere Life Ins. Co.* (2000) 23 Cal.4th 368, 374 [97 Cal.Rptr.2d 67, 1 P.3d 658], citing *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity." (3 Couch on Insurance (2002 supp.) § 35:7, p. 2.) Thus, allowing assignment of pretransfer benefits neither increases the insurer's risk nor alters the insurer's defense burden.

The risk insured against does not increase because the insurer's duty to defend and indemnify relates to an injury or damage which was suffered by the claimant *prior* to the assignment of benefits to a successor corporation. As the court stated in *Northern Ins. Co. of New York v. Allied Mut. Ins.* (9th Cir. 1992) 955 F.2d 1353, 1358 (*Northern Insurance*): "[T]he rationale for honoring 'no assignment' clauses vanishes when liability arises from presale activity. [Citation.] Insurers take account of the nature of the insured when issuing a policy. Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. An assignment could alter

drastically the insurer's exposure depending on the nature of the new insured. 'No assignment' clauses protect against any such unforeseen increase in risk. When the loss occurs before the transfer, however, the characteristics of the successor are of little importance: regardless of any transfer the insurer still covers only the risk it evaluated when it wrote the policy." (See also *Westoil, supra,* 73 Cal.App.4th at p. 642 [finding that where the loss occurred during the policy period and the assignment occurred after the loss, "any transfer of the policies . . . did not in any fashion increase the risk to respondents"].)

In addition, the assignment of the right to recover for an injury occurring prior to the transfer does not necessarily change the nature of the burden on the insurer. As the *Northern Insurance* court stated: "The nature of the risk, rather than the particular characteristics of the defendant, will have the greater effect on defense costs. The extent and character of the defense will turn on the nature of the product itself and the attributes of the firm that manufactured the product. Aspects of the successor firm could affect the defense, but the shape of the defense will be determined largely by the characteristics of the risk originally insured. Admittedly, defense costs could balloon if the successor firm failed to cooperate in the defense. Inasmuch as the successor firm was not a party to the original policy, the risk of noncooperation arguably increases. Yet, the insurer is protected against this risk because it is freed of its defense obligation if the successor firm does not fulfill its duty to aid in the defense." (*Northern Insurance, supra,* 955 F.2d at p. 1358.)

The majority argues that the insurer may face an additional burden if the predecessor corporation still exists or can be revived, because an assignment of the right to recover for a presale injury could obligate the insurer to defend both the predecessor and the successor. (See maj. opn., *ante,* at pp. 944-945.) This is not the case. If a predecessor corporation assigns its insurance policy rights to a successor corporation, the insurer's legal obligations would run only to the successor. (See *Westoil, supra,* 73 Cal.App.4th at p. 642.) In addition, if there is any dispute about whether or not the right to recover under a policy was assigned to the successor, it can be resolved through a request for declaratory relief, which can be made before the insurance company fulfils any defense obligations. Once the issue of assignment is determined, the insurer's obligations will be clear and the insurer will not be forced to defend both parties. Thus, an assignment of the right to recover for presale occurrences imposes no new contractual burden on an insurer; the insurer need only defend a single party, the assignee, and only with respect to a risk that it has already agreed, and been paid, to cover.

## IV.

The majority's holding allows insurers to secure a unfair windfall. The Lockheed plaintiffs alleged that their injuries were caused by exposure to metallic chemicals manufactured by Amchem and occurred during the time in which the policies issued by defendant insurers were in effect. The insurers in this case had received premiums to insure against these types of injuries. Yet under the majority's holding, the insurers will owe no coverage to *any* party for a risk they promised to insure against and for which they were paid an agreed premium.

Moreover, the majority's conclusion could restrict corporate restructuring, reorganization, merger, or sale. If an insurance policy contains a no-assignment clause, an insured is barred from assigning the benefits of presale insurance coverage unless a claim has been reduced to a monetary sum, or unless the insurer had breached a duty at the time of assignment. Under the majority's decision, a predecessor company cannot assign the right to recover for presale injuries that have occurred, but for which no claim has yet been brought, without the consent of the insurer. Yet under our prior case law, liability for presale injuries that have occurred, but for which no claim has been brought, *can* be transferred to the successor company. (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 28 [136 Cal.Rptr. 574, 560 P.2d 3].) Even if a successor corporation does not expressly assume the liabilities of its predecessor by contract, as in this case, the successor corporation is still subject to the risk of being sued for the pretransfer torts of a predecessor. This is because liability can, in some cases, be imposed on the successor company as a matter of law, even in the face of a contractual provision excluding the assumption of liability for presale torts. (See *Ray, supra,* 19 Cal.3d at p. 31.)

A successor company would not be inclined to assume this risk of liability for the torts of a predecessor without also receiving the benefits of the predecessor's insurance coverage for presale occurrences. It is highly unlikely that a successor company would be able to obtain insurance coverage for injuries *that have already occurred* before the successor's acquisition of the business. Therefore, the only realistic way in which a successor corporation can obtain insurance coverage for the torts of its predecessor is if the predecessor is able to assign its insurance coverage benefits to the successor. The majority's decision, however, allows insurance companies the ability to veto this necessary assignment of benefits by inserting a no-assignment clause into the insurance policy. Such a rule will have the effect of inhibiting corporate reorganization or sale.

## V.

Mergers, sales, and corporate restructurings are commonplace. They should not, in themselves, serve to destroy an insured's rights to coverage for activities that occurred prior to the merger, sale, or other transaction. Yet this is what the majority concludes. By allowing insurers to veto the assignment of benefits for which coverage has been triggered, but for which a claim has not yet been brought, insurers can retain the premiums paid by the insured while escaping their coverage obligations.

An insurance contract is often an asymmetrical relationship: an insured will have fully performed, paying premiums to the insurer, long before the insurer is called on to perform at all. It makes no sense to say that any part of the insurer's obligation is destroyed by transactions that have nothing to do with the insured-against events or the insurer's obligations. If the injuries for which a claim is brought occur during the policy period, the insurer is obliged to cover the injury, and the insured has a right to recover benefits from the insurer. Any subsequent transfer of this right to recover has no effect on the insurer's contractual obligations. An insurer should not be able to evade these responsibilities by inserting a no-assignment clause into the insurance contract. Unlike the majority, I adhere to the rule, recognized by courts of this and other states, that an insured can assign the right to recover for injuries occurring prior to the transfer without obtaining the consent of the insurer. Therefore, I dissent.